Filed 1/27/26  P. v. Salazar CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E086118 |
| v. | (Super.Ct.No. INF2200131) |
| SERGIO LOPEZ SALAZAR, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jerry C. Yang, Judge.  Affirmed.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Sergio Lopez Salazar appeals from the judgment entered after a jury found him guilty of corporal injury on a spouse (Pen. Code, § 273.5; unlabeled statutory references are to this code) and related offenses.  The trial court sentenced him to four years in state

1

prison. We appointed counsel to represent Salazar on appeal, and counsel filed an opening brief that raised no issues and requested an independent review of the record under *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *Anders v. California* (1967) 386 U.S. 738. We affirm.

BACKGROUND

In January 2025, the People filed a first amended information charging Salazar with making a criminal threat (§ 422), inflicting corporal injury on a spouse (§ 273.5, subd. (a)), assault with a deadly weapon (§ 245, subd. (a)(1)), false imprisonment (§ 236), and preventing or dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)). The People alleged that he used a deadly weapon in the commission of the corporal injury count (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)), and they alleged as aggravating factors that he took advantage of a position of trust and confidence (Cal. Rules of Court, rule 4.421(a)(11)) and was armed with and used a deadly weapon (Cal. Rules of Court, rule 4.421(a)(2)). The information also alleged that Salazar had a prior strike conviction. (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1).)

At trial, the victim testified that she and Salazar were married for "almost 30 years." She lived with Salazar and her two youngest daughters in a house in Cathedral City, and her oldest daughter (Karen) lived with her husband (Jonathan) in a "casita" behind the main house.

By December 2021, the victim had been asking Salazar for a "divorce for about two years." Salazar "would get furious" when she asked, and "[h]e would mistreat [her] and kick [her] out of the house."

On December 30, 2021, when the victim left work, she saw that she had missed calls from Salazar because she "had forgotten [her] phone in the car." She called him back, and "he was already upset." He called her a "whore," and it made her feel "very bad." He told her that they would "'talk at home,' and then he hung up."

Salazar "arrived right after" the victim got home. He was "very upset," and he "started questioning [her]." She sat on the couch and said that she "did not want to argue." He stood close to her and put one of his legs between her legs so that she could not get up. She told him to stop, and he told her that "he was going to kill [her]." She said not to hit her, "because [she] was gonna call the police," and he "threw [her] phone some distance and grabbed [her] by the hair and tossed [her] down." He tried to strangle her, but she bit him on the hand. She was "very afraid" because nobody else was home.

Salazar dragged the victim by her hair to a bedroom, and he said that he was going to kill her and that nobody would hear. "[H]e got on top of [her] and he bent [her] neck completely." "[H]e slammed [her] head on the ground, and he was hitting [her] face and [her] mouth." She "started screaming really loud, calling [her] daughter Karen. But he placed a bunch of paper in [her] mouth." She "was able to take [the paper] out, and then he wanted [her] to say—he wanted to record [her] saying, on his cell phone, that [she] was with somebody else; that [she] was not working. He wanted to record [her] saying

3

that.  And he told [her] that if [she] didn't say it, he was going to kill [her].  And that's when he took out the knife and put it on [her] neck."  She testified that the blade cut her "a little bit."

Salazar continued to strike the victim "for about an hour," and she continued to scream for help.  They heard someone in the kitchen, and Salazar put the knife in his pocket.  The victim started "hitting the door so that [the] person who was in the kitchen [could] hear [her]."  Jonathan heard the noise and came to see what was happening.  The victim asked him to call the police because "otherwise [Salazar was] going to kill [her]."  Salazar told him to leave, and Jonathan told Salazar to "let [her] go, not to hit [her] anymore."  "When Jonathan noticed that he wasn't listening, he called [her] daughter Karen, and she arrived."  Karen "told him to let [her] go; otherwise, she was going to call the police."  Salazar told Karen "not to get involved with something that was none of her business," and Karen called the police "right there and then in front of [the victim] when [Salazar] wouldn't listen, when he wouldn't stop."  Salazar "grabbed his sweater, his keys, and he left with his family."

Firefighter paramedic Kenneth Skinner testified for the defense.  Skinner responded to the victim's home after Karen called 911.  Skinner assessed her and determined that "she was alert and oriented and able to answer all questions of her appropriately, which were to person, place, and time."  He reported that "it appeared that she had some swelling, soft-tissue swelling, to her face," and she had "complaints of pain to the head, neck, and left forearm.  And then I believe abdominal pain as well."  Skinner

4

testified that he had checked her for "cuts or abrasions or bruising," and he did not see any noted in his report. He testified that he would have noted them in his report if he had located any. Skinner also testified that he "check[ed] her head for any bumps or swelling," and he did not find anything. He recommended that she be transferred to the hospital to be assessed for any internal injuries. The victim refused to be transported, and Karen took her to the hospital.

On cross-examination, the People showed Skinner photographs of the victim, and he acknowledged that there were visible injuries that were not noted in his report.

During closing argument, defense counsel argued that the victim was "guilty of embellishment. Something clearly happened here; right? She had the swelling to the mouth. She had the blood." He argued that "this is one of those cases where we have a situation where Karen and Jonathan walk in. And we know from then on what happens. But I would argue that prior to that, while we know something happened, based on those inconsistencies and credibility issues, you can't say beyond a reasonable doubt what happened during that time."

The jury found Salazar guilty of making a criminal threat, corporal injury on a spouse, false imprisonment, and preventing a witness from reporting a crime, and it found that he took advantage of a position of trust or confidence. The jury found that Salazar was not guilty of assault with a deadly weapon, and it found the alleged aggravating factor that he was armed with and used a deadly weapon not true.

5

At the sentencing hearing, Salazar admitted the prior strike allegation, and the court granted his motion to dismiss the prior strike conviction pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. The trial court sentenced Salazar to the low term of two years for inflicting corporal injury on a spouse, plus two years for preventing a witness from reporting a crime. The court stayed the sentences on the criminal threat and false imprisonment convictions pursuant to section 654. The court dismissed the assault with a deadly weapon charge, and it awarded Salazar 91 days of actual custody credit and 90 days of conduct credit for a total of 181 days.

## DISCUSSION

Salazar's appellate counsel filed a *Wende* brief identifying two potentially arguable issues: (1) "[w]hether the court should have given a self-defense (CALCRIM 3470) or mutual combat (CALCRIM 3471) instruction as requested by the defense"; and (2) "whether the recording of the 911 call should have been excluded as hearsay." Counsel asked that we conduct an independent review of the record. We advised Salazar that he had 30 days to file a personal supplemental brief, and we received no response.

We have independently reviewed the record and found no arguable error that would result in a disposition more favorable to Salazar. (*Wende*, *supra*, 25 Cal.3d at pp. 441-442.) Accordingly, we affirm the judgment.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ _____

J.

We concur:

CODRINGTON _____

      Acting P. J.

RAPHAEL _____

      J.